# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.R. MCFARLANE, K.M. MCDONALD, M.K. JAMISON**
Appellate Military Judges

### UNITED STATES OF AMERICA

v.

### BRIAN T. HART
### MASTER-AT-ARMS SEAMAN (E-3), U.S. NAVY

### NMCCA 201300295
### GENERAL COURT-MARTIAL

**Sentence Adjudged**: 15 November 2012.
**Military Judge**: LtCol Charles C. Hale, USMC.
**Convening Authority**: Commandant, Naval District Washington, Washington Navy Yard, Washington, DC.
**Staff Judge Advocate's Recommendation**: LCDR J.D. Pilling, JAGC, USN.
**For Appellant**: LT Jessica L. Fickey, JAGC, USN.
**For Appellee**: Maj David N. Roberts, USMC; LCDR Keith B. Lofland, JAGC, USN; LT Ian D. MacLean, JAGC, USN.

### 19 August 2014

---
### OPINION OF THE COURT
---

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

JAMISON, Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of unpremeditated murder, involuntary manslaughter, aggravated assault, negligent homicide, and child endangerment in violation of Articles 118(3), 119, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 918(3), 919, 928, and 934. The members sentenced the appellant to reduction to pay grade E-1,

forfeiture of all pay and allowances, confinement for a period of twelve years, and a dishonorable discharge.  The convening authority (CA) approved the adjudged sentence.[1]

The appellant raises four assignments of error (AOE).  In his first AOE, the appellant argues that the military judge abused his discretion in not dismissing the convictions for involuntary manslaughter, negligent homicide, and child endangerment based on a claim of an unreasonable multiplication of charges.  In his second AOE, the appellant argues that he is entitled to sentence relief for excessive post-trial processing delay.  Next, he argues in his third AOE that the CA did not include in his action administrative credit for fourteen days of pretrial confinement that the appellant spent in a civilian confinement facility.  Finally, in his fourth AOE, the appellant argues that the evidence that led to the conviction for unpremeditated murder is factually and legally insufficient.[2]

After consideration of the pleadings of the parties and the record of trial, we conclude that two of the appellant's AOEs have merit and warrant relief.  Specifically, we find merit in AOE I, but for different reasons than those advocated by the appellant.  We also find merit in AOE III and will order appropriate action in our decretal paragraph.  We find the remaining AOEs without merit.

In all other respects, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed.  Arts. 59(a) and 66(c), UCMJ.

## I. Background

On 26 March 2010, Master-at-Arms Seaman (MASN) JH gave birth to BLH.  The appellant, BLH's biological father, was dating MASN JH at the time of BLH's birth.[3]  The victim, BLH, was born approximately sixteen weeks premature and spent more than three months in the neonatal intensive care unit (NICU) at Johns Hopkins Hospital.  She showed satisfactory progress while at the NICU, progressing from her birth weight of approximately one

---

[1] The court-martial order fails to note the adjudged forfeiture of all pay and allowances.  We will order corrective action in our decretal paragraph.

[2] The appellant's fourth AOE is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] The couple married on 6 November 2010.  Defense Exhibit R.

pound five ounces to a healthy seven pounds. Based on her satisfactory progress, BLH was released into the care of her parents on 11 July 2010. Prior to BLH's release from Johns Hopkins, the appellant and MASN JH spent approximately three and one half weeks receiving training on how to care for a baby born prematurely, to include the dangers of severe brain injury from shaking the baby.

The appellant and MASN JH coordinated with their respective work sections to ensure that they could provide continuous care of BLH. During July and August of 2010, MASN JH worked shifts from 0600 until 1400 and the appellant worked shifts from 2200 until 0600. Prosecution Exhibit 13. Initially, BLH continued to progress in accordance with developmental milestones for infants her age. She had follow-up medical appointments at Johns Hopkins on 13 and 23 July 2010, both of which were positive.

On or about 3 August 2010, BLH developed an elevated temperature. After MASN JH consulted with a nurse over the phone, she gave BLH infant ibuprofen and BLH's temperature went back to normal. On 5 August 2010, BLH vomited and MASN JH noticed that BLH's leg was twitching. Concerned about the vomiting, MASN JH made a medical appointment for BLH for Monday, 9 August 2010.

At approximately 0515 on 7 August 2010, MASN JH left for work. Prior to leaving, she checked on BLH who appeared to be fine. When MASN JH returned from work shortly after 1400, BLH looked pale and was having difficulty breathing. The appellant and MASN JH took BLH to the St. Mary's County Hospital in Maryland, where BLH was intubated and subsequently transferred via life-flight helicopter to Georgetown University Hospital. Medical doctors at Georgetown conducted a series of tests and discovered that BLH had recent and healed rib fractures and recent and old subdural hematomas. Based on the medical assessment and feedback from the appellant and MASN JH, the doctors suspected non-accidental trauma and reported this to local law enforcement.

Five days later, detectives from the sheriff's office in St. Mary's County interviewed the appellant and MASN JH. Having established that the appellant had been BLH's sole caregiver while MASN JH was at work on 5 and 6 August 2010, the detectives asked him what could have caused BLH's injuries. While he denied knowing any cause of the injuries, the appellant suggested that BLH's injuries may have occurred when she was in

the care of the NICU at Johns Hopkins, or that the family dog may have jumped on her.

BLH was taken off life support on 12 August 2010 and died within minutes. The autopsy revealed multiple rib fractures, subdural bleeding, as well as a right temporal and parietal subdural hemorrhage consistent with blunt force trauma. The medical examiner, Dr. SP, concluded that the cause of death was multiple blunt force injuries and the manner of death was homicide. PE 15. This conclusion was based, in part, on Dr. SP finding seven specific injuries consistent with blunt force trauma. *Id.* Dr. CR, the Assistant Medical Examiner for the State of Rhode Island and a neuropathologist, conducted a post-mortem exam of BLH's skull and brain, and concluded that BLH had suffered multiple hemorrhages in the subdural and subarachnoid areas of the brain. *Id.*; Record at 1803-05. Additionally, Dr. AJ, a neuroradiologist, testified that based on the scans of her skull, BLH had a fracture on the left side of her skull. Record at 1653.

On 13 August 2010, local detectives arrived at the appellant's house and requested that he accompany them to the police station. He complied. At the police station, the appellant was given the appropriate rights warnings and he waived those rights. During the interrogation, the appellant eventually admitted to picking up BLH forcefully and shaking her, causing her neck to snap back and forth on 7 August 2010 and on another occasion, approximately a week earlier. PE 2.

The appellant was arrested by the local authorities and remained in civilian confinement from 13 August until 26 August 2010. Ultimately, the Navy assumed jurisdiction over the appellant's case. Following an Article 32, UCMJ, pretrial investigation, the CA referred the following charges: unpremeditated murder; involuntary manslaughter; aggravated assault; negligent homicide; child endangerment; and, reckless endangerment.[4] Additional facts necessary for the resolution of a particular AOE are included below.

## II. Factual and Legal Sufficiency

In his fourth AOE, the appellant argues that the evidence was factually and legally insufficient to sustain his conviction

---

[4] The Government moved to withdraw and dismissed the reckless endangerment specification at trial. Record at 676; Charge Sheet.

for unpremeditated murder of BLH.[5]  His sufficiency claim primarily addresses causation.  He argues that since the evidence at trial established two conflicting medical conclusions as to the cause of BLH's death, this rendered the finding of unpremeditated murder factually and legally insufficient.  We disagree.

We review questions of legal and factual sufficiency *de novo*.  *United States v. Winckelmann*, 70 M.J. 403, 406 (C.A.A.F. 2011).  The test for legal sufficiency is whether a rational trier of fact could have found that the evidence met the essential elements of the charged offense, viewing the evidence in a light most favorable to the Government.  *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987).  The test for factual sufficiency is whether we are convinced of the appellant's guilt beyond a reasonable doubt, allowing for the fact that we did not personally observe the witnesses.  *Id*. at 325.

The term "reasonable doubt" does not mean that the evidence must be free of any conflict.  *United States v. Rankin*, 63 M.J. 552, 557 (N.M.Ct.Crim.App. 2006), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007).  When weighing the credibility of a witness, this court, like a fact-finder at trial, examines whether discrepancies in witness testimony resulted from an innocent mistake such as a lapse of memory or a deliberate lie.  *United States. v. Goode*, 54 M.J. 836, 844 (N.M.Crim.Ct.App 2001).  Additionally, the members may "believe one part of a witness' testimony and disbelieve another."  *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979).

We find that the medical evidence presented to the members was clearly of sufficient weight and magnitude for the members to conclude beyond a reasonable doubt that the cause of death was non-accidental blunt force trauma consistent with being shaken and slammed.  The appellant's medical expert testified that BLH died of natural causes due to her having suffered ischemic strokes; however, he could not pinpoint the underlying cause of these strokes.  The Government's medical evidence established that BLH did not present risk factors for stroke and that forcefully shaking a baby multiple times -- consistent with

---

[5] The appellant's AOE is styled as a claim of factual and legal insufficiency with regard to the appellant's "convictions for the death of BLH." Appellant's Brief of 2 Dec 2013 at 17.  Because we dismiss the appellant's convictions for involuntary manslaughter and negligent homicide later in this opinion, we consider only the unpremeditated murder conviction as it relates to BLH's death.

the appellant's admissions -- can lead to bleeding of the brain and eventual stroke.

Next, the appellant argues that because the appellant did not actually admit to causing blunt force trauma to BLH the evidence was factually and legally insufficient. We find this argument unpersuasive. The circumstantial evidence that the Government offered was strong with regard to establishing the source and cause of BLH's multiple injuries. First, in addition to his admission that he forcefully shook BLH on two occasions, the appellant admitted to police that BLH's head hit the bassinette when he picked her up in a forceful manner. Second, MASN JH testified that only she and the appellant cared for, and had custody of, BLH. Third, MASN JH denied ever shaking or hurting BLH and testified that the appellant was in sole custody of BLH during the relevant time. Fourth, the medical evidence, to include BLH's autopsy, revealed multiple injuries all consistent with non-accidental trauma.

Having conducted our own assessment, we find that the evidence was both legally and factually sufficient to conclude beyond a reasonable doubt that non-accidental blunt force trauma was the cause of BLH's death and that the appellant's actions caused her injuries and death.

### III. UMC, Multiplicity, and Double Jeopardy

Based on the medical evidence and the appellant's admission of having forcefully shaken BLH on two separate occasions, the prosecution's charging theory focused on contingencies-of-proof: first, the appellant's conduct that took place on 7 August 2010, which led to BLH's death (unpremeditated murder, involuntary manslaughter, and negligent homicide); and second, the appellant's prior assaultive conduct (two specifications of aggravated assault and child endangerment) between 11 July (the date of BLH's release from the Johns Hopkins NICU) and 7 August 2010.

At trial, the appellant moved the court to dismiss the negligent homicide and child endangerment specifications. Appellate Exhibit V. The motion sought dismissal of these offenses on the basis that they represented an unreasonable multiplication of charges (UMC). *Id*. Similar to his argument at trial, the appellant now argues that the military judge abused his discretion in not dismissing the involuntary manslaughter and negligent homicide offenses on the basis that they were unreasonably multiplied with the unpremeditated murder

6

offense.  Additionally, the appellant argues that the military judge abused his discretion in not dismissing the child endangerment offense as unreasonably multiplied with the aggravated assault offense.

In this case, the military judge elected to merge for sentencing purposes the unpremeditated murder, involuntary manslaughter, and negligent homicide.  Record at 3146; AE CXIX.[6]  Similarly, the military judge merged for purpose of sentencing the aggravated assault and child endangerment offenses.  Record at 3221; AE CXIX.

The appellant properly concedes that his punitive exposure did not increase because the military judge merged the negligent homicide and involuntary manslaughter with the unpremeditated murder and further merged the child endangerment with the aggravated assault.  Appellant's Brief of 2 Dec 2013 at 11.  Thus, our focus is whether the military judge abused his discretion in not dismissing the merged offenses.  *See United States v. Campbell*, 71 M.J. 19, 25 (C.A.A.F. 2012) (holding that within the context of UMC, a military judge has wide discretion to dismiss offenses, to merge offenses, or, to merge offenses only for purposes of sentencing).  In conducting our analysis, we first consider the three offenses associated with BLH's death prior to moving to the two offenses associated with the appellant's earlier assaultive conduct.

**A. Homicide of BLH**

Prior to considering the appellant's UMC claim, we consider whether involuntary manslaughter and negligent homicide are multiplicious as lesser included offenses (LIOs) of unpremeditated murder.  If so, dismissal of both charges is the proper remedy because multiple convictions for the "same offence" would represent a constitutional violation rooted in the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution.  *See North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (stating that the "guarantee [within the Double Jeopardy Clause] has been said to consist of three separate constitutional protections.  It protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense.") (footnotes omitted)), *overruled on other grounds* by *Alabama v. Smith*, 490 U.S. 794, 803 (1989).

---

[6] Appellate Exhibit CXIX is mislabeled in the record as AE XXVIII.

The application of multiplicity to charged offenses has bedeviled practitioners and jurists for years. *See Whalen v. United States*, 445 U.S. 684, 700 (1980) (Rehnquist, J., dissenting) (stating that the two words "same offense" in the Double Jeopardy Clause is "deceptively simple in appearance but virtually kaleidoscopic in application"); *see also Albernaz v. United States*, 450 U.S. 333, 343 (1981) (stating that application of the *Blockburger* test for multiplicity is a "veritable Sargasso Sea which could not fail to challenge the most intrepid judicial navigator").

Our superior court has over the years adopted different tests for multiplicity within the context of evaluating LIOs. *See generally United States v. Jones*, 68 M.J. 465, 470 (C.A.A.F. 2010) (noting that following *United States v. Teters*, 37 M.J. 370 (C.M.A. 1993), in which the court adopted the LIO test articulated in *Schmuck v. United States*, 489 U.S. 705 (1989), the court had "drifted significantly" from *Teters*).[7]

The holding in *Jones* changed the LIO landscape and served to cast into doubt the President's interpretation in the Manual for Courts-Martial, United States (2012 ed.) as to what constitutes an LIO. *See Jones*, 68 M.J. at 472 (rejecting the President's ability to define LIOs and stating that "Congress *has not* delegated to the President a general authority to determine whether an offense is 'necessarily included' in the charged offense under Article 79, UCMJ." (footnote and citation omitted)).

What is and what is not an LIO can have significant implications for purposes of appellate review. For example, a military judge has a duty to instruct on LIOs "unless affirmatively waived by the defense." *United States v. Strachan*, 35 M.J. 362, 364 (C.M.A. 1992) (citation omitted). Within the context of an alleged homicide, in *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000), the Court of Appeals for the Armed Forces (CAAF) set aside Hospitalman Davis's conviction for involuntary manslaughter because the court concluded that the military judge committed plain error by failing to instruct on the LIO of "negligent homicide."

---

[7] As an example of that "drift," the court in *Jones* cited *United States v. Hudson*, 59 M.J. 357 (C.A.A.F. 2004) in which the court rejected as unsupportable an LIO test that "'lin[es] up elements realistically and determin[es] whether each element of the supposed "lesser" offense is rationally derivative of one or more elements of the other offense -- and vice versa.'" *Jones*, 68 M.J. at 470 (quoting *United States v. Foster*, 40 M.J. 140, 146 (C.M.A. 1994)).

Finding ourselves at the analytical crossroads of the CAAF's UMC case law and its LIO case law in *Jones*, we confront the double jeopardy implications of these charged offenses (murder, involuntary manslaughter, and negligent homicide), which were specifically charged for contingencies-of-proof. We begin by considering first the appellant's involuntary manslaughter conviction.

### 1. Involuntary Manslaughter

To ascertain whether a particular offense is an LIO, a legal issue we consider *de novo*, *United States v. Miller*, 67 M.J. 385, 387 (C.A.A.F. 2009), we compare the elements of the appellant's conviction for unpremeditated murder with his conviction for involuntary manslaughter. If the elements of involuntary manslaughter are either the same as, or a subset of, the elements of unpremeditated murder, involuntary manslaughter is an LIO. *Jones*, 68 M.J. at 469-70; *see United States v. Alston*, 69 M.J. 214, 216 (C.A.A.F. 2010) (stating that to ascertain whether elements are "necessarily included" for purposes of LIO analysis, courts use "'normal principles of statutory construction'" (quoting *Carter v. United States*, 530 U.S. 255, 263 (2000)).

Unpremeditated murder under Article 118(3) has five elements: (1) a death; (2) the accused caused the death by an intentional act; (3) the intentional act was inherently dangerous to another and showed a wanton disregard for human life; (4) the accused knew that death or great bodily harm was a probable consequence of the act; and, (5) the killing was unlawful. MCM, Part IV, ¶ 43b(3). Involuntary manslaughter has four elements: (1) a death; (2) that the accused caused the death by an act or omission; (3) the killing was unlawful; and (4) that this act or omission constituted culpable negligence. Art. 119, UCMJ; MCM, Part IV, ¶ 44b(2).

Unpremeditated murder under Article 118(3) requires that an accused show wanton disregard for human life and that he knew that death or great bodily harm was a probable consequence, while involuntary manslaughter requires that an accused act with culpable negligence. Culpable negligence is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission. Art. 119, UCMJ; MCM, Part IV, ¶ 44c(2)(a)(i).

Under the circumstances of this case, culpable negligence by shaking BLH and causing blunt force trauma to her head is a

9

subset of the same act done with wanton disregard for human life knowing that death or great bodily harm was a probable consequence. *See United States v. Dalton*, 71 M.J. 632, 634 (N.M.Ct.Crim.App. 2012) (holding that involuntary manslaughter is an LIO of unpremeditated murder under an Article 118(2) theory), *aff'd*, 72 M.J. 446-47 (C.A.A.F. 2013) (summary disposition).[8]

Because the involuntary manslaughter of BLH is a subset of unpremeditated murder of BLH, we dismiss the involuntary manslaughter as an LIO of the unpremeditated murder.[9]

## 2. Negligent Homicide

The Government also charged the appellant with negligent homicide in the killing of BLH. The negligent homicide was based on the exact same acts as the unpremeditated murder and involuntary manslaughter. Prior to *Jones* and *United States v. McMurrin*, 70 M.J. 15 (C.A.A.F. 2011), our task would have been simple, because negligent homicide had always been thought of as an LIO of both murder and involuntary manslaughter.

Negligent homicide was treated as an LIO to murder and manslaughter prior to Congress enacting the UCMJ. *United States v. Kick*, 7 M.J. 82 (C.M.A. 1979); MANUAL FOR COURTS-MARTIAL, UNITED STATES ARMY 1949, ¶ 180a; *see* MANUAL FOR COURTS-MARTIAL, UNITED STATES, 1951, ¶¶ 198a and 198b. This position was reaffirmed by the CAAF's predecessor court. *See United States v. McGhee*, 32 M.J. 322, 325 (C.M.A. 1991) (stating that "we are quite convinced that negligent homicide is a lesser included offense of involuntary manslaughter at least under Article 119(b)(1)[, UCMJ]").

*Jones* signaled a departure from considering offenses under Article 134, UCMJ, as LIOs of enumerated offenses. And in *United States v. Girouard*, 70 M.J. 5, 9 (C.A.A.F. 2011), the CAAF explicitly held that negligent homicide is "not an LIO of premeditated murder." That same term, the CAAF held in *McMurrin*

---

[8] Although the CAAF affirmed *Dalton*, the court noted that we erred when we stated that our comparison of the elements of murder and involuntary manslaughter be "viewed in the light of human experience." *Dalton*, 72 M.J. at 446-47. The CAAF struck that part of our opinion, but otherwise affirmed. *Id*.

[9] We note that at time of trial, the military judge did not have the benefit of the CAAF's partial affirmance of our opinion in *Dalton* and was concerned about dismissing a charge if that charge was not an LIO. Record at 2890.

that negligent homicide is not an LIO of involuntary manslaughter.  70 M.J. at 18.

Although both *Girouard* and *McMurrin* considered negligent homicide within the context of the Fifth Amendment's Due Process Clause for purposes of ensuring that an accused has proper notice of every element that he is being charged with, neither case considered the application of multiplicity to its respective holding.  In fact, we confront an issue that Chief Judge Baker presaged in *Jones*.  *See Jones*, 68 M.J. at 474 n.2 (Baker, J., dissenting) (stating that by its holding, the "majority has . . . eliminated the issue of multiplicity . . . .").

The CAAF recently ruled on a case remarkably similar to this case; however, the court's summary disposition offers little in the way of guidance.  In *United States v. Wickware*, No. 38074, 2013 CCA LEXIS 856, unpublished op. (A.F.Ct.Crim.App. 10 Oct 2013), the Air Force Court of Criminal Appeals (AFCCA) confronted a multiplicity and UMC claim based on Airman First Class Wickware having been convicted of unpremeditated murder, involuntary manslaughter, and negligent homicide for shaking or using some other form of excessive force resulting in his infant son's death.  The AFCCA affirmed and rejected Airman Wickware's multiplicy/UMC claim, reasoning that because the military judge merged the offenses for purposes of sentencing, Airman Wickware did not suffer any prejudice.  He appealed and the CAAF granted the appeal to the following issue:

> WHETHER APPELLANT'S CONVICTIONS FOR INVOLUNTARY MANSLAUGHTER AND NEGLIGENT HOMICIDE, WHICH WERE CHARGED IN THE ALTERNATIVE TO THE OFFENSE OF UNPREMEDITATED MURDER, SHOULD BE DISMISSED AS APPELLANT WAS CONVICTED OF UNPREMEDITATED MURDER.

On 16 May 2014, the CAAF set aside the findings of guilty and dismissed the involuntary manslaughter and negligent homicide offenses.  *United States v. Wickware*, __ M.J. __, 2014 CAAF LEXIS 527 (C.A.A.F. May 16, 2014) (summary disposition).  Because the CAAF elected not to cite to any case law, we are unclear whether the CAAF dismissed the manslaughter and negligent homicide on multiplicity or UMC grounds.  Informed by CAAF's binding decision in *Wickware*, we consider the appellant's negligent homicide conviction.

We begin with the general premise that we are skeptical Congress intended an appellant to be convicted of unpremeditated

11

murder and negligent homicide for the exact same act.  It is beyond peradventure that the President had no such intent in mind because negligent homicide continues to be listed as an LIO to unpremeditated murder and involuntary manslaughter.  *See* MCM, Part IV, ¶¶ 43d(2) and 44d(2).  This does not end our analysis, however, because the CAAF has explicitly held that negligent homicide is not an LIO of involuntary manslaughter or murder.  *McMurrin*, 70 M.J. at 18; *Girouard*, 70 M.J. at 9.  Because neither *McMurrin* nor *Girouard* strictly analyzed the implications of the Double Jeopardy Clause, we next consider the implications of having two convictions for the same act within the context of the Double Jeopardy Clause.[10]

Because *Jones* eschewed each CAAF holding that suggested anything other than a strict "*Teters* application of *Schmuck* with respect to LIOs," *Jones*, 68 M.J. at 470, we look to Supreme Court jurisprudence interpreting the Double Jeopardy Clause.  We find within *United States v. Dixon*, 509 U.S. 688 (1993), a basis within the Double Jeopardy Clause to dismiss the appellant's conviction for negligent homicide because, under the circumstances of this case, we find it to be "a species of lesser-included offense."  *Id.* at 698 (quoting *Illinois v. Vitale*, 447 U.S. 410, 420 (1980)).[11]

In *Dixon*, the Respondent, Mr. Alvin Dixon, was arrested for murder and released on bail.  As a condition of bail, his bail release form specified that he could not commit any offense and

---

[10] Although the CAAF did not address multiplicity in either *Girouard* or *McMurrin*, the CAAF has cited *Schmuck* within the context of the CAAF's LIO test for multiplicity.  *See, e.g., United States v. Traxler*, 39 M.J. 476, 479 (C.M.A. 1994).

[11] To be clear, *Dixon* is not a multiplicity case.  Rather, it relies on a separate theory under the Double Jeopardy Clause -- the prohibition against a successive prosecution for the same "offence."  Because we believe that the Double Jeopardy Clause and Article 44(a), UCMJ, would protect the appellant against a successive prosecution for negligent homicide (in the event he had hypothetically been acquitted or convicted of either murder or manslaughter and *not* charged with negligent homicide), we find *Dixon* instructive with regard to multiple convictions in the same court-martial.  We interpret the unpremeditated murder and negligent homicide to be the same "offence" in that the factual characteristics of each offense are exactly the same.  We do not discount the requirement to plead and prove the service discrediting element of the appellant's conduct in order to convict him of negligent homicide; however, we consider that element somewhat unique within the context of our analysis in that the facts necessary to prove service discrediting conduct do not directly relate to, or change, the factual characteristics of the underlying homicide.  Rather, those facts relate to the *effect* that the conduct had on the armed forces.  *See* MCM, Part IV, ¶ 60c(3).

12

if he did he could be prosecuted for contempt of court. While awaiting his trial for murder, he was "arrested and indicted for possession of cocaine with intent to distribute." *Id.* at 691. Dixon was charged with and convicted of contempt of court for possession of cocaine. Following his conviction for contempt of court, he moved to dismiss the underlying criminal indictment for cocaine possession. He argued that the indictment should be dismissed on double jeopardy grounds and the district court agreed.

The United States appealed and the District of Columbia Court of Appeals concluded *inter alia* that the Double Jeopardy Clause barred the subsequent prosecution of Dixon's case. The United States sought a writ of *certiorari* on the following issue: "whether the Double Jeopardy Clause bars prosecution of a defendant on substantive criminal charges based on the same conduct for which he previously has been held in criminal contempt of court."[12] *Id.* at 694.

Writing for the Court, Justice Scalia concluded that Dixon's underlying cocaine possession charge was a "species of lesser-included offense" because his drug offense did not contain any element that was not contained in the contempt of court conviction. *Id.* at 698-700. Justice Scalia's analysis relied heavily on *Harris v. Oklahoma*, 433 U.S. 682 (1977) (*per curiam*).

In *Harris* the Petitioner was convicted of felony murder in which the underlying felony was robbery by firearms. Following his first conviction, Harris was prosecuted in a separate proceeding for robbery with firearms. He unsuccessfully moved to dismiss his second prosecution based on a claim that it violated the Double Jeopardy Clause. The Oklahoma Court of Criminal Appeals affirmed the second conviction. *Harris v. State*, 555 P.2d 76 (Okla. Crim.App. 1976). The Oklahoma Court of Criminal Appeals used an elemental comparison approach under *Blockburger*[13] and concluded that the offenses of felony murder

---

[12] We also note that in *Dixon*, the Supreme Court overruled *Grady v. Corbin*, 495 U.S. 508 (1990), which had adopted a "same-conduct" rule as opposed to the "same offence" rule under *Blockburger* for purposes of analyzing the implications of the Double Jeopardy Clause. *Dixon*, 509 U.S. at 704. The District of Columbia Court of Appeals relied on *Grady* to conclude that Dixon's subsequent prosecution "w[as] barred by the Double Jeopardy Clause." *Id.* at 694.

[13] In *United States v. Blockburger*, 284 U.S. 299, 304 (1932), the Supreme Court adopted the strict elements test for determining whether two offenses are different for purposes of the Double Jeopardy Clause. Two offenses are

13

and robbery with firearms are not identical because "proof of an additional distinct fact is required that is not necessary to prove in the trial of the other." *Id*. at 80 (citations omitted). In a *per curiam* opinion, the Supreme Court reversed, holding that Harris's conviction for felony murder, in which the underlying felony was robbery, barred his subsequent prosecution for robbery.[14] The Court in *Harris* stated: "[w]hen, as here, conviction of a greater crime, murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime after conviction of the greater one." *Harris*, 433 U.S. at 682 (citations omitted).

For the reasons outlined in *Harris*, the *Dixon* Court concluded that the Double Jeopardy Clause barred Dixon's subsequent prosecution for cocaine possession. Although only Justice Kennedy joined the entire opinion of the Court, Justice White wrote a concurrence in which he agreed that application of the Double Jeopardy Clause to Dixon's case compelled the conclusion that his subsequent prosecution for cocaine possession was "impermissible." *Id*. at 731.[15] Writing his own concurrence, Justice Souter agreed that Dixon's subsequent

different if "each provision requires proof of a fact which the other does not." *Id*. at 304. In *Teters*, the court explicitly adopted the strict elements test of *Blockburger* and overruled the prior "fairly embraced" test articulated in *United States v. Baker*, 14 M.J. 361 (C.M.A. 1983). *Teters*, 37 M.J. at 376.

[14] In *Vitale*, the Supreme Court also analyzed *Harris* and recognized that Oklahoma's felony-murder statute "did not require proof of a robbery to establish felony murder." *Vitale*, 447 U.S. at 420. Nevertheless, the *Vitale* Court explained that the *Harris* Court had treated the subsequent robbery prosecution "as a species of a lesser-included offense." *Id*. We believe that *Vitale* further informs our analysis in this case. Vitale was speeding in a car when he struck and killed two children. He was issued a traffic citation charging him with failure to reduce his speed to avoid the accident. He was convicted and sentenced to pay a fine of $15.00. He was subsequently charged with involuntary manslaughter. Vitale moved to dismiss on the grounds that his subsequent prosecution violated the Double Jeopardy Clause. The trial court agreed and the Supreme Court of Illinois affirmed concluding that Vitale's manslaughter prosecution was barred by the Double Jeopardy Clause. The Supreme Court granted *certiorari* and remanded the case. The Court reasoned that if the subsequent prosecution relied on "a failure to slow" as the act necessary to prove involuntary manslaughter, "Vitale would have a substantial claim" under the Double Jeopardy Clause. *Id*. at 421. In this case, the Government relied on the exact same *actus reus* for both unpremeditated murder and negligent homicide.

[15] Justice Stevens joined Justice White's concurrence, concurring in the judgment of the Court that Mr. Dixon's subsequent prosecution for cocaine use violated the Double Jeopardy Clause. *Dixon*, 509 U.S. at 721 n. 18.

14

prosecution for cocaine possession would be "barred by the Double Jeopardy Clause." *Id*. at 744. Accordingly, five Justices concluded that Mr. Dixon's subsequent prosecution for cocaine possession would violate the Double Jeopardy Clause.[16]

Chief Justice Rehnquist, joined by Justices O'Connor and Thomas, disagreed that the Double Jeopardy Clause prohibited Mr. Dixon's subsequent prosecution for cocaine possession because under *Blockburger*, contempt of court has two elements (a court order and a willful violation of that order) that are not contained in the underlying offense of cocaine possession. Additionally, Chief Justice Rehnquist concluded that under *Blockburger* no element of cocaine possession "is necessarily satisfied by proof that a defendant has been found guilty of contempt of court." *Id*. at 716. Citing to *Harris*, Chief Justice Rehnquist argued that *Harris* should be limited "to the context in which it arose: where crimes in question are analogous to greater and lesser included offenses." *Id*. at 714.

In this case, the prosecution's charging theory was clearly a case in which the murder of BLH was "analogous to [the] . . . lesser included offense[]" of negligent homicide. *Id*. But for the fact that the Government had to prove that killing BLH was service discrediting conduct, it would have been impossible to commit murder on a 118(3) theory without also committing negligent homicide. It is clear, and the Government conceded at trial, that the murder, involuntary manslaughter, and negligent homicide were based on the same factual transaction or "offence" -- killing BLH by "shaking her with his [the appellant's] hands and causing blunt force trauma to her head." Charge Sheet.

Thus, under the unique circumstances of this case, we hold that if the Government elects to charge negligent homicide as a lesser offense as part of a contingencies-of-proof theory-of-prosecution, negligent homicide would be "a species of lesser-included offense." *Dixon*, 509 U.S. at 698; *see Whalen*, 445 U.S. at 694 (holding that Congress did not intend separate convictions for felony murder in the course of a rape and also conviction for the underlying rape even though under

---

[16] Justice Blackmun disagreed with the proposition that the Double Jeopardy Clause prohibited Dixon's subsequent prosecution for cocaine use because he reasoned that contempt of court represents a special type of offense apart from the underlying substantive offense. *Id*. at 742. If, however, Dixon's case would have involved "successive prosecutions under the substantive criminal law . . . I would agree that the Double Jeopardy Clause would bar [Dixon's] subsequent prosecution." *Id*. at 741-42 (Blackmun, J., concurring in the judgment in part and dissenting in part).

15

*Blockburger*, felony murder does not always require proof of a rape). Accordingly, we dismiss the appellant's conviction for negligent homicide on this ground as opposed to the appellant's argument that the negligent homicide conviction be dismissed on a UMC theory.[17]

## B. Aggravated Assault and Child Endangerment involving BLH

Based on the appellant's admission that he had previously shaken BLH and the medical evidence showing that BLH had rib fractures and a subdural hematoma that had occurred prior to 7 August 2019, the prosecution charged the appellant with two specifications of aggravated assault and one specification of child endangerment.

The appellant now argues that the military judge abused his discretion in not dismissing the child endangerment offense as unreasonably multiplied with the two specifications of aggravated assault.[18] Appellant's Brief at 10. We disagree.

We review UMC claims under an abuse of discretion standard. *Campbell*, 71 M.J. at 22. In determining whether a UMC claim exists, we consider five factors: (1) did the appellant object at trial; (2) are the charges aimed at distinctly separate criminal acts; (3) do the charges misrepresent or exaggerate the acts; (4) do the charges unreasonably increase the appellant's punitive exposure; and, (5) is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges and specifications? *United States v. Quiroz*, 57 M.J. 583, 585-86 (N.M.Ct.Crim.App. 2002) (*en banc*), *aff'd*, 58 M.J. 183 (C.A.A.F. 2003) (summary disposition).

---

[17] We are hard-pressed to conclude that the Government's decision to charge negligent homicide even approaches prosecutorial overreaching -- a primary reason for why the UMC theory exists. First, pleading in the alternative was expressly suggested by the CAAF. *See Jones*, 68 M.J. at 472 (explicitly stating that "the government is always free to plead in the alternative"). Second, under *McMurrin*, pleading negligent homicide would be a requirement if the Government wanted to rely on the lesser mental state of negligence.

[18] Based on our review of the record, we find that the military judge consolidated the two specifications of aggravated assault for sentencing. Record at 3221. He instructed the members to consider the single specification of aggravated assault as one offense with the child endangerment specification. *Id*. at 3221. While unclear, it appears that the Government conceded the military judge's ruling that the two aggravated assault specifications be consolidated into a "sole specification." *Id*. at 3154-55. We will take action to consolidate these two specifications for aggravated assault in our decretal paragraph.

16

In this case, the military judge merged the offenses for sentencing, and the appellant concedes this fact. Appellant's Brief at 11. While the military judge made the observation that the assault and child endangerment offense could be viewed as separately punishable given the "societal protections" associated with the offense of child endangerment, he merged them for purposes of sentencing based on the concession of the Government. Record at 3157. He instructed the members to consider the assault and child endangerment as one event for purposes of imposing sentence. *Id.* at 3221; AE CXIX.

Under the circumstances of this case, we find that the military judge acted within his discretion by instructing the members that the child endangerment offense was to be treated as a single offense with the aggravated assault offense. In fact, we agree with the military judge's observation that the child endangerment offense could have been separately punishable. In any event, we hold that the military judge did not abuse his discretion by merging the offenses for purposes of sentencing.

## IV. Post-Trial Processing Delay

In his second assignment of error, the appellant argues that he was prejudiced by post-trial processing delay in that the CA did not take his action until 252 days after completion of trial. While the appellant does not claim that the delay in post-trial processing rose to the level of a due process violation, he requests that we order 132 days of post-trial confinement credit under Article 66(c), UCMJ. Appellant's Brief at 13-14. Prior to conducting our analysis under Article 66(c), UCMJ, we first consider the due process implications associated with this facially unreasonable period of post-trial processing delay.

Whether an appellant has been deprived of his due process right to a speedy appellate review is a question of law that we review *de novo*. In *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), the CAAF adopted the four-part test in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), for all prospective claims of post-trial processing delay. In conducting our analysis, we balance the "(1) length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and, (4) prejudice." *Id.* (citations omitted). No one factor is determinative and we decide whether each factor favors the Government or the appellant. *Id.* at 136.

17

Analysis of a claim of post-trial processing delay begins with a determination whether the delay in question is facially unreasonable. *Id*. at 135-36. If the period between completion of the trial and the CA's final action is greater than 120 days, we presume the delay to be facially unreasonable. *Id*. at 142. The delay between completion of the appellant's court-martial and the CA's action totaled 252 days, triggering a full *Moreno/Barker* analysis. *See id*.

The presumption of unreasonableness can be overcome by a showing of legitimate, case specific circumstances. *Id.* at 142-43; *see also United States v. Arriaga*, 70 M.J. 51, 56-57 (C.A.A.F 2011). Here, unlike in *Moreno*, the post-trial processing delay was caused by more than just administrative matters and manpower constraints. In his memorandum to the Office of the Judge Advocate General, the CA explained that the initial delay was due to administrative confusion associated with securing funding approval for transcription services for the record of trial. Commandant, NDW ltr 5811 Ser N00J/237 of 25 Jul 13.[19] This delay accounted for 43 days. While this delay was not an example of bureaucratic efficiency, we do not believe it was facially unreasonable within the meaning of *Moreno* in that this initial 43-day delay spanned the 2012 holiday season. The most significant cause of the delay in timely post-trial processing, however, was the unacceptably poor quality of transcription by the civilian transcription company that was awarded the contract to complete the transcription of the court-martial record. *Id*.

While administrative matters within the control of the Government are illegitimate justifications for post-trial processing delay, *Arriaga*, 70 M.J. at 57, under the unique circumstances of this case, we find that the unacceptable state of the transcribed record provided on Day 77 to the Region Legal Service Office responsible for post-trial processing was unanticipated. We find it reasonable for the Government, when it awards a contract, to expect a minimally sufficient professional product processed in a timely manner. The Government received neither in this case.

---

[19] Manual of the Judge Advocate General, Judge Advocate General Instruction 5800.7F, § 0151(a)(4) (26 Jun 2012), requires the CA to personally sign a letter addressed to the Office of the Judge Advocate General that provides an explanation for post-trial processing delay whenever more than 120 days pass from the date of trial to the date of the CA's action.

Additionally, we find no evidence that the Government could have anticipated that the transcription process would have been found so wanting. Portions of the record had to be sent back to the transcriber and the military judge had to complete an audio review of certain portions of the record.[20] Additionally, this was a large record of trial consisting of 18 volumes and 6,866 pages.

Next, we examine whether the appellant objected to the delay or asserted his right to timely review. *See Arriaga*, 70 M.J. at 57. Here, the appellant did not object to the delay or assert his right to a timely review prior to his appeal in this court. However, because the obligation to ensure a timely post-trial process ultimately rests with the Government, this factor only slightly weighs against the appellant. *See id.*

Analyzing the fourth factor, prejudice, we consider three interests associated with prompt post-trial processing: (1) prevention of oppressive incarceration; (2) minimization of anxiety and concern of those awaiting the outcome of their appeals; and, (3) limitation of the possibility that a convicted person's grounds for appeal, and his defense -- in the event of reversal and retrial -- might be impaired by the delay. *Moreno*, 63 M.J. at 138-41. Addressing the relevant sub-factors, we conclude that the appellant has failed to meet his burden of establishing prejudice.

To demonstrate prejudice flowing from oppressive incarceration, the appellant must succeed on a substantive legal claim. *Id.* at 139. Although we found merit in two of the appellant's four AOEs, in neither instance did we conclude that the appellant suffered substantive prejudice. We conclude that our decision to consolidate one charge and dismiss two others does not rise to the level of a substantive claim within the meaning of *Moreno*.[21]

---

[20] According to the CA's post-trial processing letter, the military judge had to complete an audio review of 29 discrepancies within the record of trial. This is corroborated by the military judge's authentication certificate of 28 June 2013. Additionally, in his authentication certificate, the military judge annotated 19 discrepancies that included missing prosecution and appellate exhibits.

[21] With regard to AOE III, we did not find, and the appellant does not claim, prejudice flowing from the CA's failure to annotate in his action the fourteen days of pretrial confinement credit.

Similarly, the appellant does not demonstrate nor claim "'particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision.'" *Arriaga*, 70 M.J. at 58 (quoting *Moreno*, 63 M.J. at 140). While the appellant makes a glancing reference to having had to endure "the anxiety of waiting for his clemency determination," Appellant's Brief at 15, this is insufficient to show particularized anxiety.[22]

We next consider whether this is an appropriate case to exercise our authority to grant relief under Article 66(c), UCMJ, in light of *Toohey v. United States*, 60 M.J. 100, 101-02 (C.A.A.F. 2004), *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002), and the factors articulated in *United States v. Brown*, 62 M.J. 602, 607 (N.M.Ct.Crim.App. 2005) (*en banc*). Having done so, we find the post-trial processing delay does not affect the findings or the sentence that should be approved in this case. The length and complexity of the record of trial, in combination with the unanticipated delay associated with the civilian transcription company's lack of proficiency in processing this military record of trial, provide a sufficient explanation for the delay. Additionally, we do not find any bad faith or gross negligence on the part of the Government. Accordingly, we decline to grant relief.

## V. Administrative Credit for Civilian Pretrial Confinement

In his third AOE, the appellant argues that that the CA erred in not awarding sentence credit of fourteen days that the appellant spent in a pretrial confinement in a civilian facility. Appellant's Brief at 16. The Government conceded the appellant's entitlement to administrative credit both at trial and on appeal. Accordingly, we will order corrective action in our decretal paragraph.

## VI. Conclusion

The finding of guilty of Charge II and its specification (involuntary manslaughter) and Specification 1 of Charge IV (negligent homicide) are set aside and Charge II and its specification and Specification 1 of Charge IV are dismissed.

Specifications 1 and 2 of Charge III are consolidated into one specification under Charge III to read as follows:

---

[22] Because we provided limited relief, but otherwise affirm the findings and adjudged sentence, sub-factor (3) is not applicable to our prejudice analysis.

In that Master-At-Arms Seaman Brian T. Hart, U.S. Navy, Naval District Washington, Washington, D.C., on active duty, did, at or near Lexington Park, Maryland, between on or about 11 July 2010 to on or about 7 August 2010, commit assaults upon B.L.H. a child under the age of 16 years, by squeezing and shaking her with his hands with a means likely to produce death or grievous bodily harm to wit: breaking her ribs and causing blunt force trauma to her head.

With these modifications, we affirm the findings. Based on our action on the findings, we have reassessed the sentence under the principles contained in *United States v. Moffeit*, 63 M.J. 40 (C.A.A.F. 2006). Having done so, we conclude that the adjudged sentence for the remaining offenses would have been at least the same as that adjudged by the members and approved by the CA.

The supplemental court-martial order will properly reflect that the adjudged sentence included total forfeiture of pay and allowances and the administrative pretrial confinement credit for the fourteen days that the appellant spent in civilian confinement.

Senior Judge MCFARLANE and Judge MCDONALD concur.

For the Court

R.H. TROIDL
Clerk of Court

21